UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Slumberland Franchising, Inc. and
Slumberland, Inc.,

                              Plaintiffs,

v.

When Pigs Fly LLC, a Wisconsin limited
liability company, and Diane K. Watson,
individually,

                              Defendants.

_____

CASE TYPE: Contract Dispute

Civil No. 0:10-cv-03847-MJD-JJK

**DEFENDANTS' AND ROBERT BREMER'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT AND SANCTIONS**

**INTRODUCTION**

    Defendants When Pigs Fly, LLC ("WPF"), Diane K. Watson ("Watson") and Robert Bremer ("Bremer") (collectively referred to as "Respondents" herein) submit this Memorandum in opposition to Plaintiffs' Motion for Contempt and Sanctions.

    Plaintiffs' motion should fail in all respects. Plaintiffs are not entitled to a finding of contempt or an award of sanctions and/or attorneys' fees, because Respondents made every effort and took all reasonable steps necessary to comply with this Court's Temporary Restraining Order ("Order"). Additionally, Plaintiffs' have failed to support their motion by providing an Affidavit from the very person upon whom their claims are based and, instead, have relied on hearsay, double hearsay (if this is an appropriate term), failed to investigate the facts and circumstances surrounding their claims and kept material evidence from the Court's view. Plaintiffs' have also failed to provide an Affidavit in support of their claim for attorneys' fees.

## STATEMENT OF FACTS

### Efforts to Comply with Order

Respondents understood the terms of the Order. (Aff. Watson ¶2 and Aff. Bremer ¶2). Respondents moved their furniture inventory to a location that would not violate the Order. (Aff. Watson ¶3; Aff. Bremer ¶3; and Aff. Freeburg ¶4). Respondents made sure there were no references to "Slumberland" on the new location, signage associated with the new location, or within the building. (Aff. Watson ¶4; Aff. Bremer ¶4; and Aff. Powell ¶7.c). Respondents obtained a telephone number not associated with the previous "Slumberland" store in Richland Center and which probable customers would recognize as the telephone number of the old Achenbach Furniture Store. (Aff. Watson ¶5; Aff. Bremer ¶5; and Aff. Powell ¶7. m). Respondents removed all inventory tags from their furniture that had a "Slumberland" logo thereon and replaced all such tags with a generic inventory tag. (Aff. Watson ¶6 and Aff. Bremer ¶6). Respondents published an advertisement noticing their "liquidation sale" which contained no reference to "Slumberland" and made it abundantly clear that Respondents were under this Court's Order to cease and desist any retail furniture sales in Richland Center. (Aff. Watson ¶'s 7 and 8; Aff. Bremer ¶'s 7 and 8; and Aff. Powell ¶7.a). Respondents made arrangements with their credit card service provider to remove any reference to "Slumberland" and Richland Center from appearing on printed credit card receipts. (Aff. Watson ¶'s 9-13 and Aff. Bremer ¶'s 9-13). Respondents educated their staff to ensure that customers at the liquidation sale would not have any reason to believe that there was any connection to "Slumberland" whatsoever. (Aff. Watson ¶'s 14 and 15; and Aff. Bremer ¶'s14 and 15). Respondents took every step they could think of to comply with this Court's Order and avoid

any more problems with Plaintiffs, in particular because of the known amount of animosity of Plaintiffs' against Respondents. Aff. Watson ¶16 and Aff. Bremer ¶16).

### Inadvertent Reference to "Slumberland" on Credit Card Receipt

Despite Respondents' best efforts with their credit card service provider and due only to the negligence of the provider, a few credit card transactions from the liquidation sale in Boscobel did show the name "Slumberland" in their headers. (Aff. Watson ¶'s 18 and 20; Aff. Bremer ¶'s 18 and 20). As soon as this was discovered Respondents contacted the credit card service provider and demanded, for a second time, that any reference to "Slumberland " and the location of Richland Center be removed from credit card receipts. (Aff. Watson ¶'s 18 and 19; Aff. Bremer ¶'s 18 and 19). Respondents were so shocked and concerned about the name "Slumberland" appearing on credit card receipts that they ordered staff to stop accepting any credit card sales, even though this made selling their furniture more difficult. (Aff. Watson ¶18 and Aff. Bremer ¶18).

### John Powell's Furniture Purchase from Respondents

John Powell ("Powell") is the person whose experience forms the basis of Plaintiffs' claim for sanctions. (Aff. Freeburg, in general). Powell saw the advertisement for the liquidation sale in the newspaper. (Aff. Powell ¶7.a). Powell knew that the "Slumberland" store in Richland Center was out of business and the Boscobel liquidation sale was not a "Slumberland" affiliated sale. (Aff. Powell ¶7.a). Powell went to the Boscobel liquidation sale and was shown furniture by a woman salesperson named Vicki. (Aff. Powell ¶7.d). Powell never spoke to a male salesperson. (Aff. Powell ¶7.e). Vicki was not wearing anything that said "Slumberland" on it. (Aff. Powell ¶7.f). Vicki never did or said anything to lead Powell to believe he was buying

furniture at a "Slumberland" affiliated store. (Aff. Powell ¶7.g). Powell called in an order for a dresser and mirror after leaving the liquidation sale and then later deciding to buy same. (Aff. Powell ¶7.h and i). An unknown person at the Boscobel furniture store ran Powell's credit card to complete the sale. (Aff. Powell ¶7.i). Powell's father picked up the dresser and mirror for him and was given the Furniture Store invoice and credit card receipt. (Aff. Powell ¶7.j and Exhibit A).

### Powell's Post Purchase Activities with Respondents

After the dresser and mirror were in Powell's residence he noticed the mirror glass was broken. (Aff. Powell ¶7.k). Powell's mother and wife brought the mirror back to the Boscobel Furniture Store. (Aff. Powell ¶7.l). Around Thanksgiving in 2010, Powell looked at his Furniture Store invoice to find a telephone number to call about his broken mirror. (Aff. Powell ¶7.m). Powell did not call "Slumberland, but rather, the old Achenbach Furniture Store telephone number that was shown on his Furniture Store invoice. (Aff. Powell ¶7.m). During that call, Powell talked to a man named "Bob" who said he would look into getting the mirror fixed. (Aff. Powell ¶7.m). Powell had not heard back from "Bob" by around Christmas, so Powell again called the telephone number shown on his Furniture Store invoice, but no one answered the telephone. (Aff. Powell ¶7.n).

### Powell's Post Purchase Activities with Plaintiffs and Reynoso

Powell needed to contact "Bob" regarding his mirror so Powell looked at his Furniture Store documents and noticed that his credit card receipt had the name "Slumberland" on it. (Aff. Powell ¶7.o). Powell called "Slumberland" in the Twin Cities, not because he thought his

4

purchase had anything to do with 'Slumberland", but only because he was hoping that "Slumberland" could tell him how to reach "Bob". (Aff. Powell ¶7.o). Someone at "Slumberland Headquarters" told Powell to call the "Slumberland Store" in Baraboo, Wisconsin as they might be able to help him locate "Bob". (Aff. Powell ¶7.p). Powell called the store in Baraboo, explained his situation, and was told to send them a copy of his receipt. (Aff. Powell ¶7.q). Powell emailed to the Baraboo store both a legible copy of his Furniture Store invoice and his credit card receipt. (Aff. Powell ¶7.q; and Aff. Powell, Exhibit A). Powell did not go the Baraboo store in person. (Aff. Powell ¶7.r). Powell did talk to a person named "Kristen" from the Baraboo store, but only by telephone. (Aff. Powell ¶7.s). Kristen told Powell who manufactured his mirror and suggested he could buy another. (Aff. Powell ¶7.s). Kristen told Powell that he had purchased the mirror from somewhere other than a "Slumberland Store", which Powell already knew. (Aff. Powell ¶7.s). Kristen told Powell that "Bob" could be reached by calling his attorney named Okoneski and provided Powell with Okoneski's telephone number. (Aff. Powell ¶7.s).

## ARGUMENT

Respondents will argue their case by rebutting Plaintiffs' arguments as organized in Plaintiffs' memorandum of law. Respondents agree with Plaintiffs that the Order is clear and unambiguous. However, the proof of noncompliance is neither clear nor convincing. Respondents have been extremely diligent in attempting to reasonably comply with the Order. Even if any instance of contempt were to be found, Bremer is not a party to the Order and did not participate in any contemptible activities. Sanctions and damages for contempt are not warranted, and in any case, Plaintiffs have failed to put any responsible or material evidence of either in the record.

**Proof of Noncompliance**

As their primary proof of non-compliance, Plaintiffs argue that Powell thought the furniture he bought at Respondents' liquidation sale in Boscobel was merchandise from an authorized Slumberland® store. There is no such proof. Plaintiffs' only offer of proof to the Court on this subject is the hearsay of Reynoso, as told to Freeburg. Unlike Plaintiffs, Respondents took the initiative to contact Powell. Powell states that everything Plaintiffs' have said about his believing he bought furniture from a Slumberland® store is untrue. Powell's statements on this issue are itemized as follows:

1. "I never told Kristen Reynoso that I thought I had purchased a mirror in a store that I thought I believed was a "Slumberland Store" in Boscobel, Wisconsin." (Aff. Powell ¶3).

2. "The information contained in Paragraph 8 of the Freeburg Aff. regarding me believing that the furniture I purchased in Boscobel was from a Slumberland Store is not true. No one from the Baraboo, Wisconsin Slumberland Store could possibly know what I believed on this subject, as I never said anything to lead a reasonable person to come to such a conclusion. The truth is that I never believed that the furniture store in Boscobel was a Slumberland Furniture store." (Aff. Powell ¶6).

3. "I saw an advertisement in the Boscobel Dial newspaper about a furniture store liquidation sale. My parents were also aware of the sale. It was all of our understandings that the furniture being liquidated in Boscobel came from what

used to be the Slumberland Furniture Store in Richland Center, Wisconsin.  It is common knowledge in the area that the Slumberland Furniture Store in Richland Center, Wisconsin had gone out of business." (Aff. Powell ¶7.a).

4. "I did not see anything on the building front, any advertisement, signage, display, or anything inside the store that referenced "Slumberland" in any way." (Aff. Powell ¶7.c).

5. "Vicki [salesperson] never told me or even inferred that I was shopping at a Slumberland store." (Aff. Powell ¶7.g).

6. "I called Slumberland headquarters only to see if they knew how to reach "Bob". I did not call Slumberland because I thought I had purchased the mirror from Slumberland." (Aff. Powell ¶7.o).

7. "She [Reynoso] also told me that the mirror I bought was from the people who used to have the Slumberland Furniture Store in Richland Center, Wisconsin, and that they were out of business as a Slumberland Store ( I already knew this), …" . (Aff. Powell ¶7.s).

8. "I want to be very clear to the Court—I knew that I was buying furniture at a liquidation sale and I never thought, or told anyone else that I thought I had bought the furniture in question at a Slumberland Store." (Aff. Powell 8).

Plaintiffs could have easily located Powel and determined the truth about whom he thought he was buying furniture from, simply by calling his telephone number as shown prominently on his invoice from the "Furniture Store". (See, Exhibit A of Powell Aff.).  Powell had emailed the invoice to Baraboo. (Aff. Powell ¶4).  Respondents have submitted to the Court direct testimony on this issue from the very person Plaintiffs' purport to rely upon in support of

7

their allegations, which unequivocally denies Plaintiffs' statements and claims.  Plaintiffs' have submitted only hearsay, and dubious hearsay at that.  Plaintiffs' argument that Powell thought he was buying furniture from a Slumberland Furniture® store is fictitious, without merit, and fails.

Plaintiffs' second offer of proof of noncompliance is in the form of Powell's credit card receipt. This single item of alleged noncompliance is not compelling and is very troubling. With respect to Powell's credit card receipt itself, Respondents admit that it displays the Slumberland Furniture® mark and Richland Center location.   However, there is a reasonable explanation for this circumstance.

In advance of their liquidation sale, Respondents knew that their credit card service provider placed "Slumberland" and "Richland Center" on their printed credit card receipts.  That is precisely why Respondents made every reasonable effort to have their credit card service provider eliminate any such references.  Once it was discovered that that the credit card receipts had not been changed by their provider, Respondents not only demanded again that the provider remove the mark and location as promised, but stopped taking credit cards altogether—to their economic detriment. A complete explanation for Powell's unfortunate and unintended credit card receipt was discussed at length, with appropriate cites to Affidavits, in Respondents' Statement of Facts above.

Respondents took reasonable steps to ensure that the mark and location did not appear on Powell's credit card receipt.  The appearance of this information was due to the negligence of the credit card service provider and Respondents put an immediate stop to it once discovered.  Simply put, any noncompliance was inadvertent, not the fault of Respondents, in spite of their best efforts to comply with the Order, and diminimus.  A finding of civil contempt must be based on "clear and convincing evidence" that a court order was violated. Jordan v. Wilson, 851 F. 2d

1290, 1292 n.2 (11th Cir. 1988); Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc., 793 F.2d 1529, 1534 n. 4 (11th Cir. 1986). "This ['clear and convincing' evidence standard] is more exacting than the 'preponderance of the evidence' standard…". Jordan, 851 F.2d at 1292. In *Sizzler*, the court found that Western was in contempt because it failed to take reasonable steps to comply with an Order of the court. *Sizzler*, 793 F 2d at 1537. In this case, Respondents took all reasonable steps they could think of to comply with the Order. It would be inequitable to find Respondents in contempt of the Order over something that was not done by them, after they had done so much to comply in all respects with the Order, was an isolated occurrence, and because they rectified any noncompliance by their own accord several months before this motion was brought, and not because they were served with a motion for contempt (as is so often the case when Courts feel compelled to find contempt).

Next, let us move to the troubling part of Plaintiffs' proof of noncompliance in the form of Powell's credit card receipt. In reading paragraphs 5 and 6 of Freeburg's Affidavit together, Plaintiffs' state that Powell delivered the receipt in question to the Slumberland® store in Baraboo. But, we know this is not true because Powell states that: he never went to that store; never met Reynoso in person; and emailed the "Furniture Store" invoice and receipt in question to the store. (Aff. Powell ¶4). Powell's credit card receipt exhibited to the Court by Plaintiffs is, in fact, an accurate copy of Powell's emailed credit card receipt. (Aff. Powell ¶4). What has not been shown to the Court by Plaintiffs is the rest of the email Powell sent to the Baraboo store. (Aff. Powell ¶4).

Along with his credit card receipt, Powell emailed a copy of his invoice from the Furniture Store. (Aff. Powell ¶4). A true and correct copy of Powell's Furniture Store invoice and credit card receipt appears in Exhibit A of Powell's Affidavit. (Aff. Powell ¶4). If the Court

compares Exhibit 1 of Freeburg's Affidavit to Exhibit A of Powell's Affidavit, it becomes clear that the "blank" invoice provided to the Court by Plaintiffs is missing all of the text of the actual invoice emailed to the Baraboo store by Powell. What would Plaintiff's gain by producing a non-conforming or altered invoice for the Court's review? The answer is that the text missing from the invoice in Plaintiffs' exhibit is important. The missing text clearly indicates that Powell bought the furniture at the "Furniture Store', sans any reference to Slumberland Furniture® on his invoice. Based upon the text in Powell's actual invoice, the Court might have drawn the inference that Powell could have or should have known he was buying furniture from the "Furniture Store" , that is, someone other than Slumberland. There would at least have been a fact issue for the Court to consider. Luckily for Respondents, they were able to locate Powell and find out was actually sent and learned that Powell never believed he was buying any furniture from an authorized Slumberland Furniture® store, despite the mark on his credit card receipt.

Plaintiffs' argument that Powell's credit card receipt is a substantial item of noncompliance of the Order is not compelling or convincing. This is especially so considering Respondents' attempts with the credit card service provider to remove the mark, their immediate order to stop all credit card sales upon discovery of the mark printing out, Powell's statement that he never thought he was buying furniture from a Slumberland Furniture® store, and Plaintiffs' failure to provide an accurate copy of Powell's invoice to the Court.

The third and final attempted proof of non-compliance by Plaintiffs' is that Powell saw Bremer wearing a t-shirt at the Boscobel Furniture Store that said "Slumberland Furniture" on it. This is simply not true. Plaintiffs have not proven that Bremer was the salesperson Powell dealt with when he purchased the furniture in question. Again, Plaintiffs offer the alleged statement

10

of Reynoso, as told to Freeburg, to prove that Bremer was Powell's salesperson (Aff. Freeburg ¶'s 6 and 7). Respondents went directly to Powell and learned that: "Bob did not show the furniture while I [Powell] was shopping at the Boscobel location. That person was a woman named Vicki." (Aff. Powell ¶4); and, "The information attributed to me regarding the salesman wearing the Slumberland Furniture shirt in Paragraph 7 of the Freeburg Aff. is not true. I never made any such report to anyone and, in fact my salesperson at the furniture store in Boscobel, Wisconsin was a woman ("Vicki") and she was not wearing such a shirt." (Aff. Powell ¶5). Clearly, Powell's direct testimony is more believable than Plaintiff's offered hearsay and suspect statement from Reynoso regarding who Powell's salesperson was and what was being worn.

Based upon the forgoing, all of Plaintiffs' arguments regarding Respondents' noncompliance are without merit, substance, and in most instances, veracity. In fact, if one believes Powell over Plaintiffs', absolutely nothing Plaintiffs' say about Powell is true, except that his credit card receipt said "Slumberland" on it, which Respondents' have thoroughly explained.

### Diligent Attempt to Comply

As discussed in preceding sections herein, Respondents have diligently tried to comply with the Order. Plaintiffs give Respondents little or no credit for everything they thought of, did, and attempted to do in complying with the Order. Rather, Plaintiffs' seize on a *single* credit card receipt and a t-shirt sighting (denied by the person who was supposed to have seen it), to pound on Respondents with the punishing hammer of contempt. Not only are these single instances of alleged noncompliance not worthy of a motion (and certainly not a claim for $104,000.00), they

are based on alleged facts and circumstances that Plaintiffs' made no effort to confirm or discover, and that Respondents have proven to be explainable or completely false.

Thus, based on analysis using the *Lexus-Nexus* test, Respondents should not be found in contempt.

### **Order as Binding on All Respondents**

Respondents agree with Plaintiffs' analysis of Rule 65(d) of the Federal Rules of Civil Procedure and the various case law cited in this section of Plaintiff's Memorandum. However, Respondents definitely do not agree with the alleged facts contained in this section of Plaintiffs' Memorandum.

Plaintiffs' make an attempt to include Bremer in their demand for a finding of contempt by alleging that: (1) Bremer "was the salesman that printed and handed the receipt with the Slumberland Furniture® mark on it to the customer …"; and (2) [Bremer] wore the shirt with the Slumberland Furniture® logo;"…. (Plaintiff's memo, Pg. 6, sentence 8). These two allegations are the only alleged facts that Plaintiffs' rely upon to "hook" Bremer for knowingly and willfully using SI's marks. But, there is no evidence in the record that Bremer printed the credit card receipt with the Slumberland Furniture® mark on it. Counsel for Plaintiffs cannot simply "add" alleged facts to the Memorandum without support from an affiant. Likewise, there is no evidence in the record that Bremer handed the credit card receipt to Powell. The truth is that Powell's father was given the credit card receipt (Aff. Powell ¶7.j). There is no affidavit in the record to indicate that Bremer was present at the time Powell's father was handed the credit card receipt. There is, however, direct evidence from Powell that Bremer was not his salesperson (Aff. Powell ¶'s 4, 5, 7.d, and 7.e) and Powell never saw Bremer in a Slumberland Furniture®

logo shirt. (Aff. Powell ¶5). Therefore, Plaintiffs' arguments that Bremer was "actively engaged in infringement of SI's mark", are nonexistent or denied by Powell's direct testimony.

Under these conditions, it would not be reasonable to conclude that Bremer was "willfully" using SI's mark. Accordingly, no finding of contempt should be levied against Bremer individually, even if WPF and Watson are determined to have violated the Order. Of course, based on the forgoing and the record herein, neither WPF nor Watson should be found to be "willfully" using SI's mark either.

### Sanctions and Damages

Respondents agree that Courts can, when merited, award attorneys' fees and damages for violations of a Temporary Restraining Order. However, such an award is certainly not warranted in this case.

As an initial threshold to an award of sanctions, Plaintiffs' must convince the Court that Respondents are in contempt of the Order. For all the reasons stated above, Respondents are not in contempt. But, even if some or all of the Respondents were to be found in contempt, the attorneys' fees and damages to be awarded would have to be based upon some reasonable foundation.

Other than inserting the amount of $3,500.00 in Plaintiffs' proposed Order, there is nothing in the record to guide the Court in determining if such an amount is reasonable. It is customary and necessary for attorneys to submit Affidavits in this regard. Therefore, the Court should not consider $3,500.00 to be reasonable without a review of the actual work done, even if it were to find any Respondent in contempt of the Order.

In the event the Court were to find any contempt of the order, Plaintiffs' stated purpose for seeking sanctions is to prevent further violations. The credit card usage ceased on November 7 or 8, 2010. (Aff. Watson ¶18 and Aff. Bremer ¶18). The Furniture Store in Boscobel closed permanently during the Christmas week of 2010. (Aff. Bremer ¶ 29). These terminal events occurred months before this motion was brought by Plaintiffs. Therefore, the prevention of future violations is moot.

Plaintiffs' seek $101,000.00 in compensatory damages if contempt is found against any Respondent and sanctions are found to be warranted,. (Aff. Freeburg ¶'s10 and 11). Freeburg's "estimate" of damages appears to be a "made-up" number and completely without foundation.

There are many holes in Plaintiffs' speculative and spectacular damage calculations. First, on information and belief, Plaintiffs' have no customers as Freeburg asserts. (Aff. Freeburg ¶ 10). Plaintiffs' assert that they are due compensatory damages for lost profits. But, Plaintiff's sell nothing to retail customers. Plaintiffs' franchisees have customers. It might be arguable that franchisees may have lost sales and profits if Respondents were actually operating as if they were a "Slumberland" store (which they did not and are not), but the franchisees are not parties to this motion. Plaintiffs want the Court to believe that they, themselves, and the both of them to boot, are losing profits. This is simply not the case. Plaintiffs may earn a small percentage of a franchisee's profits as part of the franchisor/franchisee arrangement, but certainly not the type of "profits" Plaintiffs claim in this motion as compensatory damages. Plaintiffs provide no evidence of what amount Plaintiffs might have earned from any lost sales by their franchisees due to the alleged non-compliance of Respondents. Instead they pretend to be entitled to all profits of furniture sales they could never have made. Additionally, Plaintiffs' definition of "profits" is misleading and incorrect. This subject will be discussed shortly.

14

Second, it is irrelevant what credit card to cash sale ratio Slumberland franchisees experience. A two and a half month liquidation sale of left over furniture in Boscobel in an old run down and out of business Achenbach Furniture Store building (without benefit of the famed Slumberland Furniture® brand marketing machine) is in no way comparable to the sales activity Freeburg speculates about.

Third, Freeburg can't have any idea if 5 credit card sales per day at the Boscobel liquidation sale is reasonable. (Aff. Freeburg ¶10). The proof is in the pudding. In one and a half months at the Boscobel liquidation sale there were 17 or 18 credit card sales-total. (Aff. Watson ¶20). This ratio works out to about a little more than one credit card sale in an entire week or 18 sales as against Freeburg's estimated 505 sales. Freeburg's estimate is only off by 96.5%!

Fourth, Plaintiffs' state in their memorandum that: "The evidence demonstrates that Defendants and Bremer have continued to use SI's marks for over 101 days from the time they opened their new location in October, 2010" [*presumably through the date of the motion*]. (Plaintiffs' Memo, Pg.7). Yet, Freeburg calculates his idea of damages from September 17, 2010 to December 31, 2010 (Aff. Freeburg ¶11). How can we reconcile Freeburg's September 17, 2010 damages start date with his knowledge that the Boscobel store didn't open until sometime in October, 2010? (Aff. Freeburg ¶4). How can we reconcile Plaintiff's alleged damages continuing through the date of the motion when the person they cite for their calculation of damages [Freeburg] stops at December 31, 2010? (Aff. Freeburg ¶11). Respondents suggest that Plaintiff's just want to get to $101,000.00 in compensatory damages and how they get there doesn't have to make any sense.

Fifth, there is absolutely no foundation in the record for "assuming" an average sale of $200 per transaction. (Aff. Freeburg ¶11). But even assuming Freeburg's $200 per transaction, in their memorandum Plaintiffs' argue that: "Plaintiffs are entitled to the **profits** (*emphasis added*) that Defendants and Bremer have reaped from using SI's mark." (Plaintiffs' memo, Pg.7, sentence 3). Freeburg provides no guidance as to what cost of goods sold or general overhead should be deducted from gross sales of $200.00 to arrive at a suitable "**profit**" calculation. Freeburg's damage calculations, upon which Plaintiffs' rely, are not based on **profit**, but rather on the whole or gross sale! This is convenient if Plaintiffs want to get to a big damage number, but has no relationship to the reality of how profits or compensatory damages are measured.

On the issue of sanctions and damages, Respondents suggest that in the unlikely event the Court finds an actual contempt by any Respondent that is worthy of sanction, that it provide a venue for proper discovery and an adversarial type hearing to determine attorneys' fees and compensable damages.

## **CONCLUSION**

Plaintiff's' proof of noncompliance is either non-existent or so insignificant that the motion must fail. Powell never believed he was buying furniture from a Slumberland Furniture® store. Powell's credit card receipt displayed the Slumberland Furniture® mark through no fault of Respondents and despite their best efforts to comply with the Temporary Restraining Order. Respondents took immediate corrective action on the issue of credit card receipts upon discovery of same and several months before Plaintiff's brought the instant motion. Powell never saw anything at the Boscobel Furniture Store, including t-shirts, which referenced Plaintiffs' mark in any way.

Plaintiffs' allegation that Respondents did not diligently try to comply with the Order is self-serving and a gross overstatement. The single credit card receipt of Powell's is explainable, insignificant, and a minute detail for Plaintiffs' to seize upon in bringing their motion (especially seeking $104,000.00 in sanctions and damages), considering the many and diligent steps that Respondents took to comply with the Order. Under the *Lexis-Nexus* test, upon which Plaintiffs' rely, no contempt should be found.

Plaintiffs' claim that Bremer was a contributor to any alleged contempt is utterly without foundation or support in the record. Powell denies that he has ever met or even seen Bremer. Bremer did not show Powell any furniture, print Powell's credit receipt, hand the credit card receipt to Powell, or wear a t-shirt saying Slumberland Furniture® on it in Powell's presence.

Plaintiffs' demand for sanctions and damages for contempt fail because there was no contempt. Further, Plaintiffs' basis for and calculation of compensatory damages are inappropriate, confused, and unsupported by any reliable evidence within the record. Even if Plaintiffs' prevailed in achieving a finding worthy of contempt by any Respondent, Plaintiffs' speculative and spectacular claim for over $100,000.00 in damages should require an evidentiary hearing supported by discovery, proper evidence, and testimony heard pursuant to the rules of evidence.

Finally, with the exception of a single and explainable credit card receipt, every other material fact that is germane to Plaintiff's demand for a finding of contempt against Respondents is denied or refuted by John Powell—the very person to which Plaintiffs' hitch their wagon. John Powell has no horse in this race and his affidavit testimony is succinct and credible. Plaintiff's offer of proof in the form of Reynoso's hearsay, as reported in Freeburg's Affidavit, at the very least, completely misrepresents the Powell circumstances and, at worst, appears to be

pure fabrication. Plaintiffs' could have easily contacted Powell prior to bring their motion to learn the facts, but did not do so.  In fact, Plaintiffs' did not even provide the Court with an accurate copy of Powell's "Furniture Store" invoice that was emailed to Plaintiff's' franchisee and which clearly shows Powell's telephone number.

Based upon the forgoing, Respondents respectfully request that the Court deny Plaintiff's motion in all respects.  Further, Respondents advise Plaintiffs and the Court that their motion for sanctions against Plaintiffs and their counsel are being filed contemporaneously herewith and that the Affidavits offered by Plaintiffs and Respondents in connection with this motion will be relied upon in Respondents' motion for sanctions.

Respectfully submitted,

Dated:  March 17, 2011                                OKONESKI LAW FIRM, LLC

*Thomas J. Okoneski*

Thomas J. Okoneski (146791)
PO Box 9069
North St. Paul, MN  55109
Tel:  (651) 260-3524
okolaw@q.com

*Attorney for Defendants and Robert Bremer*